IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

|  |  |
|---|---|
| ELLENA DAMARR-FARUQ, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> CITY OF PLEASANTVILLE POLICE DEPARTMENT, *et al.*, <br><br> Defendants. | HONORABLE KAREN M. WILLIAMS <br><br><br> Civil Action <br> No. 1:21-cv-11866-KMW-EAP <br><br><br> **OPINION** |

**Timothy J. McIlwain, Esq.**
McIlwain Law Firm
2312 New Road, Suite 103
Northfield, NJ 08225

*Counsel for Plaintiffs Ellena Damarr-Faruq, James LaMarr, and T.B.*

**Thomas B. Reynolds, Esq.**
Reynolds & Horn, P.C.
116 S. Raleigh Avenue, Apt. 9B
Atlantic City, NJ 08401

*Counsel for Defendants City of Pleasantville, Sean Riggins, Remon Soliman, Giovanny Garcia, and Xzavier Evans*

**Christopher C. Mauro, Esq.**
Camacho Mauro Mulholland, LLP
40 Wall Street, 41st Floor
New York, NY 10005

*Counsel for Defendant RPM Development Group*

**WILLIAMS, District Judge:**

## I.    INTRODUCTION

Before the Court are two Motions for Summary Judgment filed by the defendants in this action. The first has been submitted by the City of Pleasantville; Sean Riggins, Chief of Police for the Pleasantville Police Department; and three Pleasantville police officers—Remon Soliman, Giovanny Garcia, and Xzavier Evans (together, the "State Defendants"). The second Motion is

separately submitted by their co-defendant, RPM Development Group. Both Motions have been opposed by the plaintiffs in this action—Ellena Damarr-Faruq; her minor son, T.B.; and her brother, James LaMarr (together, "Plaintiffs"). For the reasons set forth below, the foregoing Motions are granted, in part, and denied, in part.

## II.    BACKGROUND

This case arises from the alleged use of excessive force by three Pleasantville police officers during their arrest of plaintiff Ellena Damarr-Faruq ("Plaintiff") in her brother's apartment complex. On August 10, 2019, Plaintiff attended a cookout with her minor son ("T.B.") and her brother, James LaMarr ("LaMarr"). (ECF No. 101-2 ¶¶ 1, 4.[1]) Having consumed alcohol during the event, Plaintiff decided to stay the night at LaMarr's apartment in Pleasantville, New Jersey, which is owned and operated by defendant RPM Development Group ("RPM"). (*Id.* ¶¶ 3, 5.) LaMarr drove Plaintiff and her son back to his apartment, where they arrived around midnight. (*Id.* ¶ 3.)

Sometime after 1:30 a.m., Plaintiff stepped outside of the apartment complex to smoke a cigarette. (*Id.* ¶¶ 5–6.) Before she left, LaMarr provided her with his electronic key fob to ensure she could reenter the building. (*Id.* ¶ 7.) After smoking outside for approximately ten minutes, Plaintiff reentered the complex using the key fob but, upon reaching the upper floors, became disoriented and could not remember which apartment belonged to her brother. (*Id.* ¶¶ 8–9.) She proceeded to knock on various apartment doors in an attempt to find his unit, but was unsuccessful. (*Id.* ¶ 9.) Without her shoes, cell phone, or wallet, Plaintiff eventually sat on the floor at the end of the hallway, believing that LaMarr would eventually come find her. (*Id.* ¶¶ 10, 12.)

---

[1] *See* RPM's Statement of Material Facts (ECF No. 101-2.)

At some point thereafter, the RPM superintendent of the complex ("Ricardo") approached Plaintiff and asked why she was sitting in the hallway. (*Id.* ¶ 11.) Plaintiff explained that she was visiting her brother but could not recall his apartment number. (*Id.* ¶ 13.) When asked her brother's name, Plaintiff allegedly responded, "James LaMarr," to which Ricardo replied that no tenant by that name lived in the complex. (*Id.* ¶¶ 13–14.) However, there appears to be some dispute as to what precisely Plaintiff told Ricardo. While Plaintiff has testified that she correctly provided her brother's full name, RPM has suggested that she may have only provided his first name or nickname ("Mackie"). (*Id.* ¶¶ 2, 13.) Regardless, Plaintiff maintains that she correctly provided her LaMarr's full name, and that Ricardo either knew or should have known that he was a tenant. (ECF No. 119-1 at 10.[2])

The conversation between Plaintiff and Ricardo grew heated when Ricardo insisted that she could not remain in the hallway and eventually directed her to leave the premises entirely. (ECF No. 101-2 ¶ 15.) Plaintiff, however, refused to leave, instead showing Ricardo her brother's key fob to demonstrate she was not trespassing and simply awaiting her brother to come and find her. (*Id.*) When Ricardo threatened to call the police if she did not leave, Plaintiff reportedly responded, "you can call the police because I'm not moving. I'm waiting here for my brother." (*Id.* ¶ 16.) Ricardo subsequently called the Pleasantville Police Department. (*Id.* ¶¶ 16–17.)

Officers Soliman, Evans, and Garcia arrived at the complex at approximately 3:30 a.m., responding to Ricardo's report of a suspicious person inside the building. (ECF No. 102-1 ¶ 1.[3]) Ricardo informed the officers that an unknown woman had been wandering the hallways, knocking

---

[2] *See* Plaintiffs' Counterstatement of Material Facts in Opposition to RPM's Motion for Summary Judgment (ECF No. 119.)

[3] *See* State Defendants' Statement of Material Facts (ECF No. 102-1.)

on doors, and disturbing tenants. (*Id.* ¶ 2.) The officers then made contact with Plaintiff, who reiterated that she was visiting her brother but was unable to find his apartment. (*Id.* ¶ 3.)

What transpired next is heavily disputed. It is undisputed that a verbal exchange ensued between Plaintiff and the officers, culminating in her arrest on charges of disorderly conduct and resisting arrest. (*Id.* ¶¶ 4–5.) It is also undisputed that Plaintiff sustained physical injuries during the course of that arrest, namely abrasions and bruising to her face and body. (*Id.*) However, the parties sharply dispute the events that led to and resulted in those injuries, as well as whether the officers applied the force Plaintiff alleges. (*Id.*)

### A.   The Officers' Version of Events[4]

According to the officers, they first encountered Plaintiff on the third floor of the apartment complex. (ECF No. 102-4 at 1.) When asked for her brother's name, Plaintiff appeared confused and was initially unable to provide it. (*Id.* at 2.) When she eventually responded, she reportedly gave only the name "James." (*Id.*) The officers did not believe Plaintiff was trespassing and instead attempted to assist her in locating her brother's apartment. (*Id.*) Based on the limited information provided, Officer Soliman surmised that the apartment was likely on the second floor. (*Id.*) The officers, along with Plaintiff and Ricardo, agreed to walk down to the second floor to retrace her steps. (*Id.*)

As the group descended the stairs, Plaintiff began directing profanities toward Ricardo, calling him, among other things, a "f\*\*\*ing a\*\*hole." (*Id.*) Officer Soliman attempted to de-escalate the situation, advising Plaintiff that such language was unnecessary and reminding her

---

[4] In reciting the officers' version of events, the Court primarily relies on the transcripts of the deposition testimony taken from Officer Soliman (ECF No. 101-8) and Officer Garcia (ECF No. 101-7). The Court also relies on Officer Soliman's narrative contained in the Pleasantville Police Department Incident Report, dated August 11, 2019 (ECF No. 102-4). It does not appear that Officer Evans has been deposed in this case.

that Ricardo was merely doing his job. (*Id.*) Plaintiff, however, continued hurling profanities at Ricardo. (*Id.*) Once on the second floor, Officer Soliman again urged Plaintiff to stop cursing, prompting her to respond, "f*** you, you're not f***ing helping." (*Id.*) Officer Soliman then cautioned Plaintiff that it was 3:30 a.m. and asked her to lower her voice to avoid disturbing residents. (*Id.*) Plaintiff responded, "f*** you, you're a f***ing asshole too," and continued yelling. (*Id.*) Soliman was near Plaintiff and reportedly smelled alcohol on her breath (*Id.*)

In an effort to help Plaintiff locate her brother's apartment, Officer Soliman asked whether any of the units looked familiar. (*Id.*) Plaintiff then approached one of the apartment doors and began knocking. (*Id.*) Ricardo quickly advised that the unit was vacant, to which Plaintiff turned and shouted, "f*** you." (*Id.*) At that point, Officer Soliman instructed Plaintiff to leave the building and surrender the key fob, as she was causing a disturbance. (*Id.*) Plaintiff did not comply, but rather approached another unit, knocked on the door, and awakened a sleeping resident. (*Id.*) Officer Soliman repeated his directive for Plaintiff to leave the premises and warned her that she would be arrested for disorderly conduct if she did not comply. (*Id.*) Plaintiff, however, became "extremely irate," placing the key fob in her front pocket. (*Id.* at 2–3.)

As Plaintiff proceeded down the steps, Officer Soliman informed Plaintiff that she was under arrest for disorderly conduct. (*Id.* at 3.) At this point, Officer Garcia was standing in front of Plaintiff on the steps, with Officer Soliman behind Plaintiff, and Officer Evans behind him. When Officer Soliman went to arrest Plaintiff, she began to scream, pulling her arms away and refusing to comply with commands. (*Id.*) During the struggle on the steps, a fall resulted whereby Officer Garcia was pushed backwards, landing on the steps on his back. Plaintiff also fell forward and landed on Officer Garcia's chest, with Officer Soliman also falling and landing on top of Plaintiff. (*Id.*) When the officers brought Plaintiff to her feet, they noticed that she was bleeding

from her nose and mouth. (*Id.*) At this point, LaMarr appeared in the stairwell and identified Plaintiff as his sister. (*Id.*)

### B. Plaintiffs' Version of Events[5]

Plaintiffs present a remarkably different account. According to Plaintiff, when the officers first asked for her brother's name, she provided his full name: "James LaMarr." (ECF No. 101-6 at 29:23–30:13.) Although Plaintiff briefly paused before answering, she explains that this was because she instinctively considered using LaMarr's nickname, which would not have helped anyone in locating his apartment. (*Id.*) Plaintiff asserts that she explained this hesitation to the officers when they questioned her about the pause. (*Id.*)

To further demonstrate her connection to the building, Plaintiff also showed the officers her brother's key fob and explained that LaMarr had given it to her so she could reenter the building after stepping outside for a cigarette. (*Id.* at 30:16–31:2.) She also informed the officers that Ricardo had wrongly accused her of trespassing and incorrectly claimed that no tenant named James LaMarr lived in the complex. (*Id.*) The officers confirmed that Ricardo had told them the same. (*Id.*) Plaintiff concedes that, notwithstanding Ricardo's initial report, the officers did not believe that she stole the key fob or was otherwise trespassing. (ECF No. 114 at 2, ¶ 13.) She claims that the officers at least thought that her brother was in the building, but that they eventually and inexplicably "chose to forcefully arrest [her]" nevertheless. (*Id.*)

In short, Plaintiff denies that the officers attempted to assist her whatsoever. (*Id.* at 3, ¶ 1.) While she acknowledges that she may have used a "choice word" with the officers, she explains that this was only because they were forcing her to leave the building in the middle of the night—

---

[5] In reciting Plaintiffs' version of events, the Court relies on their Counterstatement of Material Facts in Opposition to the State Defendants' Motion (ECF No. 114), as well as the transcripts of the deposition testimony taken from Plaintiff (ECF No. 101-6), LaMarr (ECF No. 101-9), and T.B. (ECF No. 101-10).

without her shoes, phone, or wallet—despite her insistence that her brother lived in the building. (ECF No. 101-6 at 31:3–14.) However, she expressly denies using any profanities toward Ricardo in the officers' presence. (*Id.* at 31:5–18.) In fact, she has testified that she did not see Ricardo at any point after he threatened to call the police during their first and only interaction.[6] (*Id.* at 50:7–24.)

As the officers escorted Plaintiff down the stairs, one of them instructed her to surrender the key fob. (*Id.* at 31:21–32-12.) Plaintiff states that she reassured the officers that she would not use the key fob to reenter the building, but refused to hand it over, stating "There's no f***'n way I'm giving you this key fob because this is my brother's." (*Id.*) As Plaintiff attempted to slide the key fob into her pocket, one of the officers suddenly grabbed her arm and "wrung it" behind her back, at which point she started screaming. (*Id.* at 32:21–33:6.) Plaintiff concedes that she was resisting the officer's attempt to arrest her, but explains that it was only because it happened so quickly and without any verbal warning: "If he would have said I was under arrest at that time, I would have willingly put my hands behind my back." (*Id.*) Plaintiff has testified that during the struggle, one or more of the officers "slammed" her against the stairwell wall, which she described as being textured with a jagged, stucco-like material. (*Id.* at 33:18–25.)

Meanwhile, back at her brother's apartment, T.B. was still awake playing video games, while LaMarr was asleep. (ECF No. 101-10 at 9:2–14.) Hearing his mother's screams, T.B. ran to wake LaMarr, and the two rushed outside. (*Id.* at 10:1–12.) According to LaMarr, he and his nephew found the officers "banging her against the wall." (ECF No. 101-9 at 11:24–12:5.) LaMarr

---

[6] However, Plaintiffs' Counterstatement of Material Facts seems to simultaneously imply that there was indeed some communication between Plaintiff and Ricardo after the police had arrived. Plaintiff asserts that the officers "cut off communications" between Ricardo and Plaintiff, citing specifically to the portion of Officer Soliman's deposition testimony in which he described Plaintiff swearing directly at Ricardo during the walk to find the apartment. (ECF No. 114 at 4, ¶ 10.)

testified that the officers did not stop until he yelled, "[T]hat's my sister, what are you doing, that's my sister." (*Id.*) He describes Plaintiff as a "little, small girl," and recalled how the officers were "on top of her." (*Id.* at 15:7–10.) LaMarr has also stated that had he not intervened, the officers "would still be banging her against that frickin' wall." (*Id.* at 15:1–3.) T.B. was standing next to LaMarr at the time. (*Id.* at 12.) T.B. has not testified to witnessing any assault, but did recall seeing his "mom's face all bloody" with the "three officers [standing] next to her," and that one officer was "holding her right arm." (ECF No. 101-10 at 10:15–16.)

Following the incident, Plaintiff requested a medical evaluation, prompting Officer Soliman to summon an ambulance. (ECF Nos. 101-6 at 35:16–21; 101-8 at 96:19–97:3.) Plaintiff was transported to a nearby hospital for further evaluation. (*Id.*) The record does not contain any medical reports from the hospital or records of subsequent treatment. It does, however, contain an EMT report confirming that Plaintiff sustained abrasions to her lip, cheek, and nose, and that she had also complained of pain in her right shoulder. (ECF No. 117 at 16–21.) Plaintiff has also submitted two photographs which appear to show, albeit unclearly, a bruise on her upper-right cheek; swelling to the left side of her lower lip; and a bruise on her right shoulder. (*Id.* at 23–24.)

On May 27, 2021, Plaintiff filed her Complaint in this action and asserted claims against Officers Soliman and Garcia for excessive force under federal and state law. (ECF No. 1.) The Complaint also named as defendants the City of Pleasantville and the Chief of Police of the Pleasantville Police Department, Sean Riggins. (ECF No. 1.) An Amended Complaint was later filed on July 13, 2022, in which T.B. and LaMarr were added as Plaintiffs. It also joined Officer Evans and RPM as defendants, and added additional claims. (ECF No. 25.) Discovery is now closed in this case, and all defendants have moved for summary judgment on Plaintiffs' claims. (ECF Nos. 101, 102.)

### III.    LEGAL STANDARD

A court may grant summary judgment when the materials of record "show[ ] that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Lang v. New York Life Ins. Co.*, 721 F.2d 118, 119 (3d Cir. 1983). "A fact is 'material' under Rule 56 if its existence or nonexistence might impact the outcome of the suit under the applicable substantive law." *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)); *see also M.S. by & through Hall v. Susquehanna Twp. Sch. Dist.*, 969 F.3d 120, 125 (3d Cir. 2020) ("A fact is material if—taken as true—it would affect the outcome of the case under governing law."). Moreover, "[a] dispute over a material fact is 'genuine' if 'a reasonable jury could return a verdict for the nonmoving party.'" *Santini*, 795 F.3d at 416 (quoting *Anderson*, 477 U.S. at 248).

"The moving party bears the burden of identifying specific portions of the record that establish the absence of a genuine issue of material fact." *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). If satisfied, the burden then "shifts to the nonmoving party to go beyond the pleadings and come forward with specific facts showing that there is a *genuine issue for trial*." *Id.* (internal quotation marks omitted) (emphasis in original). To survive a motion for summary judgment, the non-moving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. *See Anderson*, 477 U.S. at 256–57. "A non-moving party may not 'rest upon mere allegations, general denials or . . . vague statements[.]'" *Trap Rock Indus., Inc. v. local 825, Int'l Union of Operating Eng'rs*, 982 F.2d 884, 890 (3d Cir. 1992) (quoting *Quiroga v. Hasbro, Inc.*, 934 F.2d 497, 500 (3d Cir. 1991)). In evaluating a summary judgment motion, the court "must view the facts in the light most favorable to the non-moving

party," and make every reasonable inference in that party's favor. *Hugh v. Butler Cty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005).

## IV.    DISCUSSION

As previously indicated, there are two Motions for Summary Judgment before the Court. The first is brought on behalf of the State Defendants, and the other on behalf of RPM. The Court will address each Motion separately.

### A.    The State Defendants' Motion

In their Motion, the State Defendants seek summary judgment with respect to each claim that has been asserted against them in this case. As against the individual officers, Plaintiff has asserted a Fourth Amendment claim for excessive force under 42 U.S.C. § 1983, as well as an analogous state law claim for battery under the New Jersey Civil Rights Act ("NJCRA"), N.J. STAT. ANN. § 10:6-2. She has also asserted a claim against the City of Pleasantville under *Monell v. N.Y.C. Dep't of Social Services*, 436 U.S. 658 (1978). For having witnessed Plaintiff's alleged injuries, T.B. and LaMarr have separately asserted their own claims against the individual officers for intentional infliction of emotional distress ("IIED"). Finally, all three Plaintiffs allege that the individual officers discriminated against them on the basis of race in violation of the New Jersey Law Against Discrimination ("NJLAD"), N.J. STAT. ANN. §§ 10:5-1 *et seq.* The Court addresses each of these claims in turn.

#### i.    *Excessive Force*

The Court first assesses Plaintiff's claims against the individual officers for excessive force pursuant to 42 U.S.C. § 1983. However, because the language of § 1983 is comparable to that of the NJCRA, the Court also addresses her state law battery claim in the same analysis. *See Williams*

*v. Ponik*, 822 F. App'x 108, 111 (3d Cir. 2020) (analyzing NJCRA claim under federal standard); *see also Coles v. Carlini*, 162 F. Supp. 3d 380, 404 (D.N.J. 2015) ("[C]ourts have repeatedly construed the NJCRA in terms nearly identical to its federal counterpart: Section 1983.").

Section 1983 is not itself a source of substantive rights, but rather "provides a cause of action for any person who has been deprived of rights secured by the Constitution or laws of the United States by a person acting under color of law." *Curley v. Klem*, 298 F.3d 271, 277 (3d Cir. 2002). It provides, in relevant part, as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]

42 U.S.C. § 1983. "Police officers, embodying the authority of the state, are liable under § 1983 when they violate someone's constitutional rights, unless they are protected by qualified immunity." *Santini*, 795 F.3d at 417 (internal quotations marks omitted).

Claims that law enforcement officers used excessive force to effectuate an arrest implicate the Fourth Amendment right to be free from unreasonable seizures. *See Rivas v. City of Passaic*, 365 F.3d 181, 198 (3d Cir. 2004) ("[A]ll claims of excessive force by police officers, in the context of an arrest, investigatory stop, or other 'seizure,' should be analyzed under the Fourth Amendment."); *Kopec v. Tate*, 361 F.3d 772, 778 (3d Cir. 2004) (recognizing that the "right of an arrestee to be free from the use of excessive force in the course of his handcuffing" is clearly established under the Fourth Amendment).[7] To prevail, a plaintiff must show (1) that a seizure

---

[7] That right has been incorporated against the States by way of the Fourteenth Amendment, and violations thereof are made actionable against state officials through § 1983. *See Curley v. Klem*, 298 F.3d 271, 277 (3d Cir. 2002) (noting that § 1983 "provides a cause of action for any person who has been deprived of rights secured by the Constitution or laws of the United States by a person acting under color of law.").

occurred; and (2) that it was unreasonable under the circumstances. *See El v. City of Pittsburgh*, 975 F.3d 327, 336 (3d Cir. 2020). Here, it is undisputed that Plaintiff was "seized" within the meaning of the Fourth Amendment. *See Torres v. Madrid*, 592 U.S. 306, 325 (2021) ("[T]he application of physical force to the body of a person with intent to restrain is a seizure even if the person does not submit and is not subdued."). Thus, the only question implicated by the State Defendants' Motion is whether the officers' use of force was reasonable under the circumstances.

The Fourth Amendment requires police officers to use "only the degree of force that is reasonably necessary to place a suspect under arrest." *Garrison v. Porch*, 376 F. App'x 274, 277 (3d Cir. 2010) (citing *Tennessee v. Garner*, 471 U.S. 1, 9–10 (1985)). The test for reasonableness is an objective one: "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 397 (1989). This inquiry requires a finder of fact to carefully consider "the totality of the circumstances surrounding the arrest," *Garrison*, 376 F. App'x at 277, and to judge them "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," *Graham*, 490 U.S. at 396. Relevant factors to consider include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [she] is actively resisting arrest or attempting to evade arrest by flight." *Graham*, at 490 U.S. at 396.[8] However, a suspect's resistance to arrest is not dispositive: "it is possible for a finding that [the plaintiff] was resisting arrest to coexist with a finding that the police used excessive force to subdue [her]." *Ramos-Ramirez v. Berwick Borough*, 819 F. App'x 103, 106 (3d Cir. 2020) (internal quotation marks omitted).

---

[8] Courts in this circuit also consider "the possibility that the persons subject to the police action are themselves violent or dangerous, the duration of the [officer's] action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time." *Sharrar v. Felsing*, 128 F.3d 810, 822 (3d Cir. 1997).

Here, the State Defendants do not appear to dispute that, if Plaintiff's version of events is credited, the officers' actions were objectively unreasonable. Instead, they argue that Plaintiff has failed to present sufficient evidence to support her account. Specifically, they contend:

> [T]he facts have established that the officers attempted in good faith to assist [Plaintiff] in locating her relative's apartment, based on what she told them, until Plaintiff became irate, loud and disruptive at 3:30 a.m., disturbing neighbors in a residential complex, prompting her arrest. Upon arrest, there was a physical struggle to handcuff [Plaintiff] in a stairwell area, where multiple bodies fell upon each other, resulting in Plaintiff's abrasion injuries. There is no evidence that [Plaintiff] was punched, kicked or beaten. At best, the evidence establishes that Plaintiff's injuries were the result of an accidental occurrence, attributable primarily to her own refusals to submit to arrest in a closed area where she and two officers fell in a heap during the struggle to lawfully handcuff her.

(ECF No. 102-2 at 4–5.) This argument is fundamentally at odds with the legal standard for summary judgment.

Plaintiff and the officers have provided two starkly conflicting versions of the events leading up to and surrounding Plaintiff's injuries. Most critically, the parties dispute the very nature of the force used, an issue that could not be any more central to Plaintiff's excessive force claim. Plaintiff has testified that her injuries resulted from being repeatedly and unnecessarily slammed against a wall by the officers. Her account is corroborated, at least in part, by the testimony of her brother. Of course, their testimony conflicts with that of the officers, who maintain that Plaintiff was injured during an accidental fall. But that is precisely the point—resolving that conflict requires "weighing the credibility of the witnesses, which the Court cannot and must not do at this procedural juncture." *Panarello v. City of Vineland*, 160 F. Supp. 3d 734, 758 (D.N.J. 2016) (denying summary judgment on excessive force claim). That directive is even more applicable here given the evidence suggesting that Plaintiff might have been under the influence of alcohol at the time. *See Suarez v. City of Bayonne*, 566 F. App'x 181, 186 (3d Cir. 2014)

("Whether [plaintiff's] testimony is worthy of credence is a question for the jury, not for the District Court on summary judgment.").

However, there is additional evidence that, if credited, could lend support to her version of events. Both the photo evidence and the EMT report documenting her facial abrasions and shoulder bruise could lead a reasonable jury to question whether her injuries are entirely consistent with a fall. Indeed, even Officer Garcia struggled during his deposition to reconcile the injuries to her face with the claim that she landed on his chest. While this evidence may not conclusively establish the unmitigated brutality Plaintiff paints in her briefings, it could lead a jury to conclude that some level of force was in fact applied, and that such force was unreasonable under the circumstances, depending on which version of events the jury finds most credible.[9] *See Adams v. City of Atl. City*, 294 F. Supp. 3d 283, 298 (D.N.J. 2018) (denying summary judgment where evidence of injuries could be consistent with plaintiff's testimony regarding use of force).

Alternatively, the State Defendants assert that the officers are entitled to qualified immunity. "But a decision on qualified immunity would be premature because there are unresolved disputes of historical fact relevant to the immunity analysis." *Williams v. Ponik*, 822 F. App'x 108, 112 (3d Cir. 2020) (internal quotation marks omitted); *see also Curley v. Klem*, 298 F.3d 271, 278 (3d Cir. 2002) ("[T]he existence of disputed, historical facts material to the objective reasonableness of an officer's conduct will give rise to a jury issue.").

In conclusion, the State Defendants have failed to demonstrate an entitlement to judgment as a matter of law. Repeatedly, the Third Circuit has instructed that because the inquiry on the

---

[9] Officer Evans' role in this case remains unclear. The record contains no allegations or claims indicating that he directly participated in the alleged assault, nor has Plaintiff asserted a failure-to-intervene claim against him. Notably, Plaintiffs' Opposition makes no specific mention of Officer Evans, and there is likewise no indication that he was deposed in this matter. Nevertheless, because the State Defendants have not specifically argued for summary judgment on these grounds, the Court's denial of their Motion extends to the claims asserted against Officer Evans as well.

reasonableness of the use of force is so fact-bound, it is generally an issue best left to the jury. *See, e.g.*, *Williams v. Ponik*, 822 F. App'x 108, 111 (3d Cir. 2020); *Abraham v. Raso*, 183 F.3d 279, 290 (3d Cir. 1999). In some cases, defendants may succeed on summary judgment, but only when, "after resolving all factual disputes in favor of the plaintiff," they can show that their "use of force was objectively reasonable under the circumstances." *Abraham*, 183 F.3d at 290 (internal quotation marks omitted). The State Defendants have not done so here. As such, their Motion for Summary Judgment must be denied.

### ii. *Municipality Liability*

The Court next addresses Plaintiff's claim against the City of Pleasantville and Chief Riggins for municipal liability under *Monell*.[10] It is well-settled that "[t]here is no respondeat superior theory of municipal liability, [and] so a city may not be held vicariously liable under § 1983 for the actions of its agents." *Sanford v. Stiles*, 456 F.3d 298, 314 (3d Cir. 2006) (citing *Monell*, 436 U.S. at 691). Stated differently, municipalities and other local governments are "responsible only for their *own* illegal acts." *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (internal quotation marks omitted) (emphasis in original); *see also Collins v. City of Harker*

---

[10] It is unclear why Chief Riggins has been named as a defendant in this case. While the caption of the Amended Complaint purports to name Chief Riggins in his individual capacity, the pleading itself mentions him only once, specifically referring to him in his official capacity "as the Chief of Police for the City of Pleasantville," (ECF No. 25 ¶ 45.) Importantly, that allegation is pled only in connection with Count III—a § 1983 claim unequivocally pled "against Defendant City of Pleasantville only." (*Id.* at 8.) To add to the confusion, the parties conflate Plaintiff's § 1983 claims against the City and Chief Riggins, referring to both as claims for "supervisory liability." However, these are distinct legal theories. Unlike claims for municipal liability, claims for supervisory liability under § 1983 require a showing of an official's "personal involvement" in the alleged misconduct. *See Chavarriaga v. New Jersey Dep't of Corr.*, 806 F.3d 210, 222 (3d Cir. 2015); *see also Diorio v. Harry*, No. 21-1416, 2022 WL 3025479, at *7 (3d Cir. Aug. 1, 2022) (addressing claims for municipal liability as distinct from claims for supervisory liability). Here, Plaintiff has neither alleged nor introduced any evidence suggesting that Chief Riggins had any involvement in the underlying incident—a threshold showing required to sustain a § 1983 claim against him in his individual capacity. In any event, any such individual-capacity claim has ostensibly been abandoned, given that Plaintiff's Opposition makes no reference to Chief Riggins or otherwise argues in support of holding him personally liable. To the extent Plaintiff instead intended to sue Chief Riggins in his official capacity, such a claim would merely be duplicative of her *Monell* claim against the City of Pleasantville—assuming, of course, that Riggins still serves as the City's Chief of Police. In any case, Chief Riggins is entitled to summary judgment on any claim asserted against him.

*Heights*, 503 U.S. 115, 122 (1992) ("The city is not vicariously liable under § 1983 for the constitutional torts of its agents: It is only liable when it can be fairly said that the city itself is the wrongdoer.").

There are two theories under which a § 1983 claim may proceed against a municipality. First, the plaintiff may put forth evidence showing that "an unconstitutional policy or custom of the municipality led to his or her injuries." *Forrest v. Parry*, 930 F.3d 93, 105 (3d Cir. 2019); *see also Williams v. Ponik*, 822 F. App'x 108, 112–13 (3d Cir. 2020). Alternatively, the plaintiff may demonstrate that their injures were "caused by a failure or inadequacy by the municipality that reflects a deliberate or conscious choice." *Forrest*, 930 F.3d at 105 (internal quotation marks omitted). While these theories represent two, distinct avenues of *Monell* liability, both entail "rigorous standards of culpability and causation . . . to ensure that the municipality is not held liable solely for the actions of its employee." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 405 (1997).

Here, Plaintiff's *Monell* claim is not precisely defined or clearly articulated. Whatever her claim might be, the State Defendants argue that summary judgment is warranted because Plaintiff has adduced no evidence to sustain it. In her Opposition, Plaintiff appears to advance two theories of municipal liability, both of which concern an alleged failure on the part of the City. Specifically, she alleges that the City failed to (1) implement and maintain a policy requiring its officers to wear body cameras at the time of the incident; and (2) train its officers in the use of force. The "essence" of both of these theories is the same: "that a state official, by virtue of his or her own deliberate indifference to known deficiencies in a government policy or procedure, has allowed to develop an environment in which there is an unreasonable risk that a constitutional injury will occur, and

that such an injury does occur." *Barkes v. First Corr. Med., Inc.*, 766 F.3d 307, 319–20 (3d Cir. 2014).

"[D]eliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence" of a course of action. *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 410 (1997) (internal quotation marks omitted). For a failure to rise to deliberate indifference, a plaintiff must show that "(1) municipal policymakers know that employees will confront a particular situation, (2) the situation involves a difficult choice or a history of employees mishandling, and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights." *Forrest*, 930 F.3d at 106 (citing *Carter v. City of Philadelphia*, 181 F.3d 339, 357 (3d Cir. 1999)). Typically, this requires evidence of a "pattern of similar constitutional violations" by municipal employees. *Connick v. Thompson*, 563 U.S. 51, 62 (2011).

"Causation is a requirement for . . . liability that is separate from deliberate indifference." *Thomas v. Cumberland Cnty.*, 749 F.3d 217, 226 (3d Cir. 2014). Establishing causation requires more than "point[ing] to something the city 'could have done' to prevent [an] unfortunate incident." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 392 (1989). Rather, it requires the plaintiff to prove that "the injury [would] have been avoided had the employee been trained [or supervised] under a program that was not deficient in the identified respect[.]" *Id.* at 391.

The Court first addresses Plaintiff's theory concerning the City's failure to implement a body-camera policy. Curiously, Plaintiff does not expressly claim that the absence of such a policy caused her injuries, but rather states that it has deprived her of "incontrovertible proof of [the officers'] unconstitutional behavior." (ECF No. 114-1 at 10.) But even accepting Plaintiff's version of events as true, the record is utterly devoid of any evidence suggesting that the absence of a

body-camera policy created an unreasonable risk of the harm she suffered; that a City policymaker was aware of and deliberately indifferent to that risk; or that the officers' alleged assault is attributable to the lack of such a policy.[11]

In lieu of proffering such evidence, Plaintiff asks the Court to take non-specific judicial notice of *Whitted v. City of Pleasantville et al.*—a since-settled 2013 case involving allegations of excessive force against unrelated Pleasantville police officers. Citing only to the case's docket number, Plaintiff summarizes that the police officers there had allegedly used "a canine to attack a suspect who had already been subdued," and that they "followed it up with a vicious attack reminiscent of Rodney King." (ECF No. 114-1 at 10.) She speculates that the absence of a body-camera policy in the wake of those allegations means that some Pleasantville policymaker must have been deliberately indifferent to her rights.

Ignoring for a moment that Plaintiff has left open the issue of causation, simply citing to a past excessive-force case against the same municipality is insufficient to establish deliberate indifference:

> [T]he mere fact that [even] a number of lawsuits have been filed, without any information as to whether the suits are meritorious or spurious, or alternatively, any evidence that the municipality ignored such complaints such that it constituted deliberate indifference to any potential problem of excessive force, does not assist a fact-finder in determining whether the [municipality] actually has a historical problem of its police officers using unconstitutionally excessive force in the performance of their duties.

---

[11] In her Opposition, Plaintiff states, without any citation to the record, that the City's lack of body cameras was "in direct contravention of the New Jersey Attorney General's directives that were adopted by the Pleasantville Police Department." (ECF No. 114-1 at 10.) The Court has scoured the parties' submissions and was unable to locate such a "directive." However, testimony from Thomas Zyckowski, the City's designated Rule 30(b)(6) witness, suggests that the Pleasantville Police Department was not required to implement body cameras until 2022, although the City voluntarily adopted a body-camera policy two years earlier. Notably, this testimony only appears secondhand in the report of Plaintiff's expert, who offers no separate analysis or opinion on the absence or impact of a body-camera policy. (ECF No. 115-1 at 19.) Unsurprisingly, Plaintiff omits these portions of Mr. Zyckowski's testimony from her submissions. (ECF No. 117 at 25–36.)

*Gonzalez v. Borough of Red Bank*, No. 18-13009, 2020 WL 2029338, at *9 (D.N.J. Apr. 28, 2020) (quoting *Ostroski v. Town of Southold*, 443 F. Supp. 2d 325, 346 (E.D.N.Y. 2006)); *Wooden v. City of Philadelphia*, No. 19-1054, 2022 WL 17724423, at *4 (E.D. Pa. Dec. 15, 2022) (granting summary judgment on *Monell* claim) ("[S]ettled lawsuits are not probative . . . because there is no finding of liability.").

Plaintiff's failure-to-train theory fairs no better, as she has not adduced any evidence of the officers' training at all, much less identified a specific deficiency in that training. Rather, she directs the Court to a 2022 administrative proceeding before the New Jersey Civil Service Commission ("NJCSC"), which resulted in the formal discipline of a Pleasantville officer for employing excessive force. (ECF No. 118.[12]) Even more narrowly, she points to a portion of the initial decision from the administrative law judge, which noted that the officer in that case did not have "individualized training on defensive tactics or take-down procedures," which was conducted online between 2019 and 2022 due to the COVID-19 pandemic. (ECF Nos. 114-1 at 11; 118 at 6–7.) Departing from her unsubstantiated opinion that this officer's training was "clearly inadequate" as a general matter, Plaintiff attempts to infer that the officers in this case might have also "received the same level of clearly inadequate training in the use of force," whatever that training entailed exactly.[13] Clearly, Plaintiff has failed to adduce any evidence to sustain this theory as well. *See Woloszyn v. Cnty. of Lawrence*, 396 F.3d 314, 325 (3d Cir. 2005) (affirming summary judgment

---

[12] *See* Initial Decision of Administrative Law Judge Tama B. Hughes, *In the Matter of Andrew Eckert, City of Pleasantville* (ECF No. 118 at 4–45); *see also* Final Administrative Action of the NJCSC (*Id.* at 1–3.)

[13] Citing to the Initial Decision, Plaintiff vaguely states that "it has been admitted that the training in excessive force in 2019 was clearly inadequate." (ECF No. 114-1 at 10.) By whom, Plaintiff does not say. However, a reading of that decision reveals no such admission was made. Apparently, the officer in that case had attempted to proffer that his training was inadequate in order to obtain a more lenient form of discipline—a suggestion that was swiftly and wholly rebuked by the administrative law judge: "To argue that mitigating factors are present in this matter because he (appellant) has not had in-person training on defensive tactics since 2017, is not only self-serving but disturbing that appellant believes that lack of in-person training should somehow factor into whether his actions were reasonable under the circumstances." (ECF No. 118 at 33.)

on *Monell* claim where plaintiff failed to identify specific, relevant training to which officials were deliberately indifferent); *see also Simmons v. City of Philadelphia*, 947 F.2d 1042, 1060 (3d Cir. 1991) ("[A] municipality's deliberately indifferent failure to train is not established by [] presenting evidence of the shortcomings of an individual[.]").

In short, Plaintiff has failed to establish a genuine issue of material fact on either of her *Monell* theories. Even if a jury were to accept her version of events concerning the officers' actions, she has adduced no evidence from which the jury could attribute her injuries to a specific failure or inadequacy on the part of the City. To this end, the State Defendants' Motion is granted.

### iii. *NJLAD Claims*

Next, the Court considers Plaintiffs' claims against the officers for race discrimination in violation of the NJLAD. The NJLAD is a comprehensive civil rights statute that broadly protects individuals in areas such as employment, housing, places of public accommodation, and various financial transactions. *See* N.J. STAT. ANN. §§ 10:4-4, 10:5-12. Here, however, the factual and legal grounds for Plaintiffs' NJLAD claims remain unclear. Plaintiffs have only cited generally to the entire statute and only allege to have been "discriminated against as African Americans and/or as an African American family." (ECF No. 25 at 16.) Ostensibly, the facts of this case could be construed as an attempt to claim that Plaintiff was denied a "public accommodation" by reason of her arrest, though she has not alleged as much. *See* N.J. STAT. ANN. § 10:5–4 (codifying right to obtain accommodations and accommodation privileges without discrimination). What is more, there is no indication in the pleadings or the record to suggest that T.B. and LaMarr have been denied any right or privilege secured by the NJLAD. To the extent the officers' actions have implicated any provision of the NJLAD, the State Defendants correctly point out that Plaintiffs have failed to adduce the evidence necessary to sustain any NJLAD claim.

Where a plaintiff alleges that a police officer violated her rights under the NJLAD, courts in this district analyze such claims using the same standard governing federal Equal Protection claims. *See, e.g.*, *Greenfield v. Trenton Police Dep't*, No. 16-04366, 2022 WL 2314869, at *8 (D.N.J. June 28, 2022); *Altidor v. Toms River Police Dep't*, No. 18-14834, 2022 WL 17155698, at *7 (D.N.J. Nov. 22, 2022); *Brooks v. Codispoti*, No. 12-05884, 2015 WL 9462086, at *10 (D.N.J. Dec. 28, 2015). Accordingly, succeeding on a NJLAD claim requires the plaintiff to demonstrate that the officer's conduct (1) "had a discriminatory effect," and (2) was "motivated by a discriminatory purpose." *Bradley v. United States*, 299 F.3d 197, 205 (3d Cir. 2002). To establish the first prong, the plaintiff must show "that she is a member of a protected class and that she was treated differently from similarly situated individuals in an unprotected class." *Id.* The burden of proving discriminatory effect may be satisfied by "naming similarly situated members of an unprotected class" who were not subjected to the same treatment "or, in some cases, by submitting statistical evidence of bias." *Id.*

As an initial matter, summary judgment is clearly warranted as to T.B. and LaMarr. There is no indication in the record that either of them has been deprived of any right, privilege, or accommodation under the statute, let alone on the basis of their race. The crux of their claims seems to rest solely on their proximity to the events giving rise to this suit—namely, the excessive force that was allegedly used to arrest Plaintiff. But their own testimony is devoid of any suggestion that they personally were subjected to any discriminatory treatment. Nor have they demonstrated how their mere association with Plaintiff would entitle them to relief under the NJLAD.

To the extent any provision of the NJLAD has been violated, Plaintiff has pointed to nothing in the record that implies disparate treatment or discriminatory animus. The only remotely

relevant rebuttal offered by her Opposition is where it speculatively asserts that it is "improbable at best that a Caucasian tenant or guest would have been treated similarly." (ECF No. 114-1 at 12.) Whatever NJLAD claims Plaintiff purports to assert, she has not adduced the evidence necessary to prove it. *See Jersey Cent. Power & Light Co. v. Township of Lacey*, 772 F.2d 1103, 1109–10 (3d Cir. 1985) (stating that statements in briefs "are not evidence and cannot by themselves create a factual dispute sufficient to defeat a summary judgment motion"); *see also Greenfield*, 2022 WL 2314869, at *9 (granting summary judgment where plaintiff "provided no evidence of discrimination on the part of the [law enforcement defendants] to support her unsubstantiated allegations").[14]

For all of these reasons, the State Defendants' Motion is granted.

### iv.  *IIED*

Lastly, the Court addresses T.B. and LaMarr's IIED claims, which they assert against the individual officers for having allegedly witnessed the infliction of Plaintiff's injuries. They purport to premise their claims on an "indirect" or "bystander" theory of liability pursuant to *Portee v. Jaffee*, 417 A.2d 521 (N.J. 1980).

Generally speaking, prevailing on an IIED claim requires a plaintiff to show "intentional and outrageous conduct by the defendant, proximate cause, and distress that is severe." *Buckley v. Trenton Saving Fund Soc.*, 544 A.2d 857, 863 (N.J. 1988). "Severe emotional distress" denotes a "severe and disabling emotional or mental condition which may be generally recognized and diagnosed by trained professionals." *Turner v. Wong*, 832 A.2d 340, 348 (N.J. Super. Ct. App.

---

[14] To the extent Plaintiffs' NJLAD claims have been asserted against the City or Chief Riggins on a theory of vicarious liability, those claims necessarily fail as a result. *See Brooks v. Codispoti*, No. 12-05884, 2015 WL 9462086, at *11 (D.N.J. Dec. 28, 2015) (citing N.J. STAT. ANN. § 59:2-2) ("Since there is not enough evidence to maintain a cause of action against the officer defendants, summary judgment must also be granted on the cause of action for vicarious liability under the NJLAD against the municipality and [the chief of police].").

Div. 2003). The distress must be "so severe that no reasonable [person] could be expected to endure it." *Delvalle v. Trino*, 286 A.3d 694, 705 (N.J. Super. Ct. App. Div. 2022) (internal quotation marks omitted).

As an initial matter, T.B. and LaMarr's IIED claims do not appear to be properly pled. As far as this Court can discern, the New Jersey Supreme Court has only authorized an "indirect" or "bystander" theory of liability for claims of negligent infliction of emotional distress ("NIED")— not IIED. *See Portee*, 417 A.2d at 528 ("The cause of action we approve today [is] for the negligent infliction of emotional distress[.]"); *see also Koeppel v. Bassett*, No. 08-04543, 2015 WL 668177, at *5 (D.N.J. Feb. 17, 2015) ("*Portee*, by its own terms, applies only to claims for NIED."). But no matter the precise legal basis for these claims, both causes of action require a showing of "severe emotional distress," the evidence of which remains unfounded in this record. *See Turner*, 832 A.2d at 348, *Portee*, 417 A.2d at 528. Indeed, Plaintiffs have adduced no evidence showing that T.B. and LaMarr have suffered any emotional distress at all, much less distress that was "so severe that no reasonable [person] could be expected to endure it." *Delvalle*, 286 A.3d at 705 (internal quotations marks omitted). Plaintiffs themselves implicitly acknowledge the absence of this evidence, which they unavailingly attempt to attribute to opposing counsel's supposed failure to ask T.B. and LaMarr about their alleged distress during their depositions. *See Celotex*, 477 U.S. at 322 (reiterating that plaintiffs bear the burden of proving the essential elements of their claims).[15]

---

[15] Separately, the Court notes a portion of Plaintiffs' Opposition in which they state that T.B. and LaMarr need not adduce any evidence of severe emotional distress to sustain their claims. Specifically, they cite to *Tarr v. Ciasulli*, 853 A.2d 921 (N.J. 2004), for the proposition that they are somehow relieved of their burdens of proving severe emotional distress because they have separately, though simultaneously, asserted claims under the NJLAD. Plaintiffs misread *Tarr*. There, the New Jersey Supreme Court interpreted the damages provision of the NJLAD with respect to emotional damages, which are expressly authorized by the statute. The Court held that the NJLAD presents a "far less stringent standard of proof" for the recovery of emotional damages—as contrasted with the distinct, more cumbersome standard applicable to common law claims for NIED and IIED. *Id.* at 928. The Court did not, as Plaintiffs suggest, eradicate their burden of proving their IIED claims under the common law. *See also Besler v. Bd. of Educ. of W. Windsor-Plainsboro Reg'l Sch. Dist.*, 993 A.2d 805, 824 (N.J. 2010) (stating that common law "[e]motional-distress

Because T.B. and LaMarr have not adduced the evidence necessary to sustain any emotional distress claim, the State Defendants' Motion must be granted.

## B. **RPM's Motion**

Plaintiffs have asserted claims against RPM under New Jersey law for negligence; negligent supervision and training; negligent infliction of emotional distress; and race discrimination in violation of the NJLAD. On each of these claims, Plaintiff generally attempts to trace back to Ricardo the injuries that were allegedly inflicted on her by the police officers. In short, she submits that she would not have sustained these injuries had Ricardo not involved the police in the first instance, but instead attempted to help her locate LaMarr's apartment. To the extent Ricardo stated that LaMarr did not live in the building, Plaintiff alleges that he either knew or should have known that he did. Insofar as any of these claims have been asserted on behalf of T.B. or LaMarr, they appear to be exclusively premised on the emotional distress they allegedly suffered for having witnessed the officers' assault. For the reasons set forth below, summary judgment is warranted on each of these claims.

### i. *Negligence*

To prevail on a negligence claim under New Jersey law, a plaintiff must establish four elements: (1) that the defendant owed plaintiff a duty of care; (2) the defendant breached that duty; (3) the defendant's breach was the proximate cause of plaintiff's injuries; and (4) the defendant suffered actual damages. *See Coleman v. Martinez*, 254 A.3d 632, 642 (N.J. 2021). Here, RPM moves for summary judgment on the grounds that Plaintiffs cannot demonstrate a breach of the

---

damages are not presumed; they must be proved"). And even if T.B. and LaMarr could otherwise sustain their NJLAD claims, the statute would most likely, if anything, preempt their IIED claims. *See Colca v. Sea Breeze Fruit Flavors, Inc.*, No. 13-6072, 2015 WL 733641, at *1 (D.N.J. Feb. 20, 2015) (granting summary judgment on preemption grounds where the plaintiff's "IIED and NIED claims [were] based on the same facts as his NJLAD claim").

duty of care owed to them, nor can they establish that any such breach proximately caused their alleged injuries.

Here, the Court strains to discern any cognizable or internally consistent theory of negligence. As a starting point, the parties do not dispute the specific duty of care that RPM owed to Plaintiffs:

> In the common areas of an apartment complex, tenants and their social guests are deemed to be business visitors of the landlord. For business visitors, the landowner owes a duty to conduct a reasonable inspection to discover latent dangerous conditions as well as to guard against any dangerous conditions . . . that the owner either knows about or should have discovered.

*Gonzalez v. Safe & Sound Sec. Corp.*, 881 A.2d 719, 730 (N.J. 2005) (citations and quotation marks omitted) (omission in original). Plaintiffs' Opposition expressly acknowledges this duty of care and does not dispute its application or scope.

However, the crux of Plaintiffs' Opposition is a series of conclusory assertions concerning Ricardo's conduct, none of which articulate how precisely that conduct constituted a vicarious breach of the specific duty Plaintiffs concede was owed to them. For instance, Plaintiffs emphasize that Ricardo "intended to have ejected from the premises at approximately 3:30 in the morning, a barefoot woman, with no cell phone, who he claims was exhibiting some signs of intoxication, onto the streets of Pleasantville." (ECF No. 119-1 at 4–5.) They further contend that the superintendent breached RPM's duty by incorrectly informing the police that Plaintiff's brother was not a tenant.[16] (*Id.*) Yet Plaintiffs offer no legal argument, nor do they cite to any authority, demonstrating how any of these actions could amount to a breach of RPM's duty to inspect and

---

[16] While the Court does not address the issue of proximate cause, it does note that Plaintiff has all but conceded that any information Ricardo allegedly gave to the police had no bearing on their subsequent interactions with her. There is no dispute that the officers did not actually believe that Plaintiff was trespassing, notwithstanding Ricardo's initial reports. (ECF No. 114 at 2, ¶ 13.) Indeed, Plaintiff expressly claims that the officers knew that her brother was a tenant in the building. (*Id.*)

guard against dangerous conditions on the premises. What is more, Plaintiffs appear to concede that RPM did not breach its duty of care to LaMarr at all, as their Opposition attempts to pivot instead to an argument that RPM violated the "well-established covenant . . . to the quiet enjoyment of his premises"—a theory distinct from negligence and entirely irrelevant to the issue at hand.[17] (*Id.* at 5.) And to the extent a negligence claim has ever been asserted on behalf of T.B., Plaintiffs' Opposition makes no mention of it.

There is a fundamental disconnect between Plaintiffs' allegations and the duty of care actually owed by RPM. It is not enough for Plaintiffs to identify conduct they find objectionable; they must explain how that conduct violated RPM's duty to protect against dangerous conditions in the common areas—a burden they have entirely failed to carry. Without any evidence or legal argument establishing a breach of the applicable duty of care, Plaintiffs' negligence claims cannot survive summary judgment. Accordingly, RPM's Motion is granted.

### ii. *Negligent Supervision & Failure to Train*

Plaintiffs have also asserted claims against RPM for negligent supervision and failure to train. Unlike claims premised on the doctrine of *respondeat superior*, claims for "negligent hiring, supervision, and training are not forms of vicarious liability," but are rather "based on the direct fault of an employer." *G.A.-H. v. K.G.G.*, 210 A.3d 907, 916 (N.J. 2019). Thus, to succeed on such a claim, the plaintiff must prove that "(1) an employer knew or had reason to know that the failure to supervise or train an employee in a certain way would create a risk of harm and (2) that risk of harm materializes and causes the plaintiff's damages." *Id.* As in all negligence cases, "[f]oresight,

---

[17] After outlining RPM's alleged breaches, Plaintiffs' Opposition makes one final, passing acknowledgement of RPM's duty of care, only there referring to it as one "not to place [Plaintiff] in what was obviously an inherently dangerous situation." (ECF No. 119-1 at 5.) This is clearly a *post hoc* attempt to move the goalposts. Plaintiffs have made no effort to square this description with the specific duty they expressly acknowledge at the outset of their argument. Moreover, they cite no legal authority that otherwise supports the existence of such a duty.

not hindsight, is the standard by which one's duty of care is to be judged." *Johnson v. Usdin Louis Co.*, 591 A.2d 959, 961 (N.J. Super. Ct. App. Div. 1991) (internal quotation marks omitted).

Here, Plaintiffs' claims for negligent supervision and training rely entirely on the same conduct alleged in support of their negligence claims. However, the critical flaw in Plaintiffs' claims is their failure to connect any of the superintendent's alleged actions to a direct fault on RPM's part. Plaintiffs have provided no evidence regarding RPM's employee training or supervision practices, let alone evidence that those practices were deficient in any particular way. Notably, there is no indication in the record that Plaintiffs deposed any RPM supervisor or employee to explore these issues.

Instead, Plaintiffs again rely on conjecture, reasoning that because Ricardo allegedly acted improperly, RPM must have failed to provide him with "basic training for an apartment house manager" or guidance on "basic interactions with guests and tenants." (ECF No. 119-1 at 9.) This argument is as speculative as it is vague. At best, it relies on impermissible "hindsight" rather than evidence of a foreseeable risk. *See Johnson*, 591 A.2d at 961. "[A]bsent any evidence as to what [RPM's] training policies were and how [it] failed to consider the type of injury that occurred in this case," Plaintiffs' claims for negligent supervision and training cannot go forward. *Brijall v. Harrah's Atl. City*, 905 F. Supp. 2d 617, 621 (D.N.J. 2012) (granting summary judgment on claims for negligent training and supervision). As such, RPM's Motion is granted.

### iii. *NIED*

The Court next addresses Plaintiffs NIED claims against RPM. Under New Jersey law, NIED "can be understood as negligent conduct that is the proximate cause of emotional distress in a person to whom the actor owes a legal duty to exercise reasonable care." *Decker v. Princeton Packet*, 561 A.2d 1122 (1989). Thus, the elements of a NIED claim are (1) the defendant owed a

duty of reasonable care to the plaintiff; (2) the defendant breached that duty; (3) the plaintiff suffered severe emotional distress; and (4) the defendant's breach of duty was the proximate cause of that distress. *See Dello Russo v. Nagel*, 817 A.2d 426, 435 (N.J. Super. Ct. App. Div. 2003).

Setting aside the specific factual allegations underlying Plaintiffs' NIED claims against RPM, the parties acknowledge that they cannot survive in the absence of actionable negligence. *See Geissler v. Catanio*, No. 16-792, 2018 WL 3141832, at *19 (D.N.J. June 27, 2018) (granting summary judgment on NIED claims where the underlying negligence claim failed). Because the Court has already found that Plaintiffs have failed to establish the breach of a duty of care, RPM's Motion on these claims must be granted.

### iv.  *NJLAD Claims*

Lastly, the Court addresses Plaintiffs' NJLAD claims against RPM for race discrimination. Unlike with their NJLAD claim against the State Defendants, Plaintiffs expressly invoke the statute's public-accommodation provision here, which makes it unlawful

> [f]or any owner, lessee, proprietor, manager, superintendent, agent, or employee of any place of public accommodation directly or indirectly to refuse, withhold from or deny to any person any of the accommodations, advantages, facilities or privileges thereof, or to discriminate against any person in the furnishing thereof[.]

*Id.* § 10:5–12(f)(1). To sustain a *prima facie* claim for the discriminatory denial of a public accommodation under the NJLAD, the plaintiff must establish three elements: (1) that the defendant operates a public accommodation; (2) that the plaintiff is a member of a protected class; and (3) that she was denied equal treatment on the basis of her membership in a protected class. *See Ali v. Hillstone Rest. Grp.*, No. 20-10547, 2022 WL 2128681, at *4 (D.N.J. June 14, 2022).

Here, the parties dispute whether the NJLAD applies in the first instance. RPM argues that a private residential apartment building is not a "place of public accommodation" within the meaning of the NJLAD. *See* N.J. STAT. ANN. § 10:5-4. In contrast, Plaintiffs insist that the building

qualifies as "other real property," as contemplated by the statute. *See id.* But this dispute leads to a dead end. Even if the NJLAD does apply, Plaintiffs have adduced no evidence to sustain their claims.

At the outset, the Court grants RPM's Motion on the NJLAD claims asserted by T.B. and LaMarr. As with their NJLAD claims against the officers, there is no allegation or evidence here showing that they have been denied any right or privilege under the statute, much less a public accommodation. Neither T.B. nor LaMarr has testified to experiencing disparate treatment, and their Opposition seems to confirm that they are merely attempting to piggyback on Plaintiff's allegations, rather than asserting any independent claims of their own.

The Court also grants summary judgment on the NJLAD claim asserted on behalf of Plaintiff. Beyond alleging that Ricardo's attempt to eject her from the premises was discriminatory, the only thing she points to in support of her claim is her membership in a protected class. However, the record remains wholly devoid of the evidence necessary to sustain the remainder of her *prima facie* burden. There is no direct evidence showing that Ricardo made any racially charged remarks, acted with overt racial animus, or otherwise signaled discriminatory intent. *See Walden v. Georgia-Pac. Corp.*, 126 F.3d 506, 512 (3d Cir. 1997) (stating that direct evidence of discrimination must be "so revealing of [discriminatory] animus" so as to render circumstantial evidence unnecessary). Nor has Plaintiff pointed to any circumstantial evidence from which a jury could infer a denial of equal treatment. *See Ali v. Hillstone Rest. Grp.*, No. 20-10547, 2022 WL 2128681, at *5 (D.N.J. June 14, 2022) (granting summary judgment on NJLAD public accommodations claim where plaintiff did not show that similarly situated patrons outside of protected class were treated differently).

In short, even if the Court were to resolve the threshold question of the NJLAD's applicability in Plaintiffs' favor, they cannot succeed on any NJLAD claim. Neither T.B. nor LaMarr have suffered any deprivation under the statute that is capable of being redressed. And even if a jury were to accept Plaintiff's version of events as true, she has adduced no evidence from which it could conclude that any complained-of treatment from Ricardo was racially motivated. To this end, RPM's Motion is granted.

## V.     CONCLUSION

For all of the reasons set forth above, the Court grants RPM's Motion for Summary Judgment in its entirety. The Court also grants the State Defendants' Motion for the reasons separately articulated, except as to Plaintiff's claims against the individual officers for excessive force under § 1983, as well as her contingent state law claims under the NJCRA. Genuine disputes of material fact preclude the entry of summary judgment, requiring their submission to a jury for factfinding.

Dated: March 17, 2025

KAREN M. WILLIAMS
U.S. DISTRICT COURT JUDGE